## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAYMOND RODRIGUEZ,<br>**Plaintiff** | : | No. 3:22cv1362 |
| | : | |
| | : | (Judge Munley) |
| **v.** | : | |
| | : | |
| LOYAL SOURCE GOVERNMENT | : | |
| SERVICES, | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>MEMORANDUM</u>

Plaintiff Raymond Rodriguez contends that he experienced age, race, and national origin discrimination after being placed to work with the United States Army and other defense contractors by Defendant Loyal Source Government Services ("Loyal Source") at the Tobyhanna Army Depot ("Army Depot"). Following his termination, Rodriguez filed suit against Loyal Source pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* After Loyal Source discovered an error in Rodriguez's charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") regarding his date of termination that implicated the statutes' time limitations, the plaintiff added a claim for race discrimination pursuant to 42 U.S.C. § 1981 ("Section 1981") through a court-permitted amended complaint. Before the court

is Loyal Source's motion for summary judgment.  The motion has been fully briefed and is ripe for disposition.

## Background

Loyal Source specializes in government contract services, including the United States Army.[1] (Doc. 42, SOF ¶ 106).  Relevant here, the United States Army Medical Material Command, Medical Maintenance Equipment Directorate awarded a contract to Goldbelt Frontier, LLC ("Goldbelt") to perform various services.  (Id. ¶ 107).  In 2019, Goldbelt executed a contract with Loyal Source for Loyal Source to perform portions of the prime contract that Goldbelt had with the United States Army. (Id. ¶ 108).  Under the subcontract, Loyal Source provided personnel and services in various locations, including at the Army Depot in Tobyhanna, Monroe County, Pennsylvania. (Id. ¶ 110).  Loyal Source is based in Orlando, Florida. (Id. ¶ 106).

Loyal Source hired Rodriguez on April 1, 2020 to work as a biomedical technician in support of the subcontract with Goldbelt at the Army Depot. (Id. ¶¶ 9, 111).  Rodriguez's position involved testing and repairing equipment for the United States Army.  (Id. ¶ 17).

---

[1] When possible, the court references Loyal Source's statement of material facts ("SOF"), (Doc. 42), for facts that are not disputed in Rodriguez's answer to that statement, (Doc. 45). Otherwise, this memorandum cites to portions of the summary judgment record supplied by the parties.  All facts from the record are construed in a light most favorable to plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015)(citation omitted).

Rodriguez worked in a facility with U.S. Army personnel and other contractors. (Doc. 40-6, Def. Ex. P. Pl. Memo to Loyal Source, May 5-6, 2021 at ECF p. 3, 8).  As many as four different defense contractors provided technicians at the site. (Id.)  Per Rodriguez, the other technicians were "all white and younger" than the plaintiff.  (Id., ECF p. 8).

Timothy Bush supervised Rodriguez's work at the Army Depot. (Doc. 42, SOF ¶ 11).  Bush did not work for Loyal Source.[2] (Id. ¶ 13).  Nonetheless, per Rodriguez, Loyal Source told him to report to Bush, who managed all the subcontractors at the worksite. (See Doc. 40-4, Def. Ex. F, Pl. Dep. 07/20/2023 40:12-47:18).  Rodriguez also reported to two other individuals, Dan Hicks and Bernie Topa. (Doc. 42, SOF ¶ 14).  Neither Hicks nor Topa worked for Loyal Source. (Id. ¶ 15).

Rodriguez contends that he experienced race and national origin discrimination by Bush and his coworkers.  Rodriguez testified that, on his first day of work, he had to park his vehicle at the main gate of the facility. (Doc. 40-3, Def. Ex. C., Pl. Dep. 06/01/2023, 190:15-192:6).  His vehicle displayed the flags of Cuba, the Dominican Republic, and Puerto Rico. (Id.)  As Bush escorted

---

[2] Rodriguez's amended complaint alleges that Bush worked for former defendant GRSI Government Resources Solutions, Inc. ("GRSI"). (Doc. 34 ¶ 10).  Rodriguez previously agreed to dismiss his complaint with prejudice on all counts against GRSI. (Docs. 13, 15).

Rodriguez from the gate, the plaintiff's supervisor allegedly remarked, "another Puerto Rican[.]" (Id.)  On a different occasion, after overhearing Rodriguez play a voicemail from his wife, Bush allegedly said, "that's Spanish, we don't speak Spanish here in this place," (see id. at 197:6-14), or "[s]hut that Spanish trash up!" (Doc. 40-6, Def. Ex. P. Pl. Memo to Loyal Source, May 5-6, 2021 at ECF p. 9).

Rodriguez also testified that he experienced discrimination by a Loyal Source coworker, Mike Tagliari.  Tagliari complained about the aroma  of Rodriguez's homemade lunches and made critical remarks about "Spanish food," as did other unnamed technicians working for other contractors.  (Doc. 40-3, Def. Ex. C., Pl. Dep. 06/01/2023, 168:14-178:8).  Bush joined in with some of the criticism.  Per Rodriguez, Bush told the plaintiff, "take that stinking food out of here, makes me sick, go eat in the back of the warehouse." (Id. 193:6-19).  Rodriguez contends that his supervisor and coworkers ostracized him based upon his race and national origin. (Id. 203:12-18).

Rodriguez also alleges that he experienced age discrimination while working at the Army Depot.  Rodriguez was 65 years old when Loyal Source hired him and placed him there. (Id. 46:3-5).   On Rodriguez's first day, Bush also allegedly said: "[Y]ou're the oldest guy in here." (Id. 215:4-17).  Per plaintiff,

throughout the assignment, Bush said things like, "at that age, you should be retired." (Id. 215:19–216:16).

Rodriguez testified that he worked slowly and carefully and did not cut corners. (Id. 208:22-210:4). Both Bush and Tagliari told Rodriguez that he worked too slowly. (Id., 208:22-210:4, 216:24–217:12). Additionally, as an example of age discrimination, Rodriguez testified that he drove "20 miles an hour" on the interstate. (Id. 210:5-214:3). Per Rodriguez, Tagliari criticized the plaintiff's driving and referred to the plaintiff as "Mr. Magoo." (Id.)

Additionally, Rodriguez's assignment involved "TDY," that is, temporary duty away from the Army Depot. (Id. 217:13–218:15). Allegedly, Bush told Rodriguez that he could not "go TDY'" because the plaintiff was "too old and too slow." (Id. 219:2-5). Rodriguez observed that Bush treated other technicians differently regarding their pace. (Id. 222:16-223:3). In his deposition, Rodriguez admitted that he worked slower than the other technicians, and that it was due to his age. (Doc. 42, SOF ¶ 46)

On July 24, 2020, about three months into Rodriguez's assignment, Bush expressed concerns about the plaintiff's performance in an email to Goldbelt's program manager, Shon McManus. (Id. ¶ 18). Bush's e-mail referenced his observations of Rodriguez's "increasingly slow pace," "lack of understanding," and "constant [required] support and assistance with even minor repairs." (Doc

42-3, Def. Ex. D, T. Bush Email 07/24/2020, ECF p. 362).  Bush wrote: "As it stands, I do not feel he would be any benefit to a TDY team due to the wide variety of equipment that he does not display any capacity for, and his pace would impede the scheduled completion of any team he is with." (Id.)

On August 6, 2020, Rodriguez reported to Loyal Source that he had slipped and fallen while at work. (Id. ¶ 38). Per Rodriguez, Bush told the plaintiff, "you didn't fall because of the water, you fell because [you're] old." (Doc. 40-4, Def. Ex. G, Pl. Dep. 07/20/2023 45:7–46:8). And two years later, during his workers' compensation case against Loyal Source, Rodriguez testified that this injury impacted his work performance because he could not lift or carry heavy objects, could not stand as long, and needed rest breaks. (Doc. 42, SOF ¶¶ 39-40).

By September 3, 2020, Bush advised McManus at Goldbelt through another email that "not much has changed." (Doc 42-3, Def. Ex. D, T. Bush Email 09/03/2020, ECF p. 361).  Bush wrote that he had taken over inputting Rodriguez's information into a work-entry system due to the plaintiff's errors. (Id.) Bush also documented Rodriguez's issues completing background investigation forms ("e-QIP") and the efforts Bush and others offered the plaintiff to no avail. (Id.)  To work at the Army Depot, Rodriguez needed to complete the e-QIP. (Doc. 40-2, SOF ¶ 23).  Five months into the assignment, Bush did "not believe

there to be any reason for further attempts." (Doc 42-3, Def. Ex. D, T. Bush Email 09/03/2020, ECF p. 361).

That same day, Shon McManus from Goldbelt forwarded Bush's e-mail to Jason Cohen, Loyal Source's Vice President with the message:

> Can your team please address the performance issues that continue to over-burden my site lead. Besides [plaintiff's] lack of productivity, the fact that [Bush] must enter information into the system of record for him is a major issue. I would like to avoid having to remove him from the contract, but we cannot continue with status quo. Your assistance is appreciated.

(Id. ECF p. 360).

Cohen forwarded the email chain to Loyal Source's account manager, Mary Varouh, with a "let's discuss." (Id.)  Varouh then forwarded the message to Sara Hernandez in Loyal Source's human resources ("HR") department. (Id.)  Varouh wrote: "I obviously need to do a counseling with him about job performance, but the other issue is his inability to do this on line [sic] questionnaire that literally every employee has been able to complete."  (Id.)

On September 4, 2020, Loyal Source sent Rodriguez an e-mail regarding the e-QIP:

> This is a standard procedure that all employees on the base have completed as part of the employment agreement. This is not done by Loyal Source which is why it was not presented to you prior to your accepting this position.

> It would appear that efforts have been made at the base to
> help [you] facilitate entering your information and
> submitting it as well. It is our understanding that they will
> allow a final attempt at completing this document
> successfully with the support of personnel during the
> process. Unfortunately, they have also indicated that it will
> be the final attempt to complete in full. If unsuccessful, you
> will not be able to secure your security requirement and will
> not be able to continue working at the base.

(Doc. 40-3, Def. Ex. E, ECF p. 366).

On September 9, 2020, Varouh followed-up again with Rodriguez regarding the e-QIP. (Id., ECF p. 365). Rodriguez responded the next morning with an email addressed to Cohen, Varouh, and Hernandez at Loyal Source alleging age and disability discrimination by Bush.[3] (Id. at 364–65). Rodriguez testified that he believed Bush did not help him enough and even hindered his efforts to complete the e-QIP requirement. (Doc. 40-3, Def. Ex. A., Pl. Dep. 06/01/2023, 231:23–242:16). Rodriguez admits that his September 10, 2020 email to Varouh at Loyal Source did not reference any claim of race or national origin discrimination by Bush. (Doc. 40-2, SOF ¶¶ 29, 31).

Six months later, on March 24, 2021, Rodriguez emailed Bush with the subject line: "Shop unfairness, etc." (Doc. 40-4, Def. Ex. K., ECF p. 2-5). The email specifically referenced age discrimination. (Id.) On March 26, 2021, Bush replied with an email responding to Rodriguez's concerns. (Id. at ECF p. 2).

---

[3] Rodriguez does not pursue a claim for disability discrimination in this matter.

8

Bush began the email: "I am sorry that you feel the way that you do. Let me assure you, I do NOT harbor any discrimination against you due to age. After all, you're only a couple of years older than myself." (Id.) Bush concluded the email by advising Rodriguez that he was on the list for an upcoming TDY mission in Alabama. (Id.) No one from Loyal Source was copied on either email from March 2021. (Id.) Neither email references anything related to race or national origin discrimination. (Id.)

On April 26, 2021, Bush forwarded an email to McManus at Goldbelt attaching a seven (7) page memorandum related to Rodriguez's performance, which included general concerns and specific issues encountered by Bush since November 2020. (Doc. 40-5, Def. Ex. L., ECF p. 7-15). McManus then forwarded the memorandum to Mary Varouh at Loyal Source with the following message:

> Please see the detailed account of Mr. Bush's observations with regards to the performance of Raymond Rodriguez. I know we had issues with him initially and were close to removing him from the contract due to his inability to complete his CAC[4] paperwork, but it these new revelations are performance based [sic]. I would like to discuss when you have time.

(Id., Def. Ex. L., ECF p. 7).[5]

---

[4] "CAC" stands for common access card. The court infers for background purposes only that Rodriguez's delay in e-QIP completion impeded a CAC being issued by the United States Department of Defense.

[5] The defendant also contends that Varouh from Loyal Source and McManus from Goldbelt then exchanged additional emails evidencing: 1) Varouh's inquiry into whether counseling or

As indicated in the March 2021 email from Bush, which has been provided by Loyal Source, Rodriguez was scheduled to "go TDY" in May 2021. (See Doc. 42, SOF ¶ 63). Rodriguez admits being informed that he needed to make his own travel arrangements for that trip. (Id. ¶ 64).

On May 4, 2021, Varouh from Loyal Source emailed Bush regarding coordination of Rodriguez's travel. (Doc. 40-5, Def. Ex. N., ECF p. 26). Bush advised Varouh by reply email: "I had asked him this morning if he had sent Loyal Source the information for his mission, and he told me that he had sent it last night." (Id.)

On May 5, 2021, at 9:53 AM, McManus from Goldbelt emailed Varouh at Loyal Source: "Can we please set up a call with Mr. Rodriguez, Tim Bush, myself and [Loyal Source] to discuss the ongoing situation? Seems like things are escalating, and I'd like to get everyone on a call." (Id., Def. Ex. O., ECF p. 30-31). Based on the subject line of the email, it appears that Rodriguez sent a text message that morning. (Id.) The specific recipient and the content of that text message, however, are not of record.

---

termination would be appropriate; 2) a recommendation from McManus (with Bush's concurrence) that Rodriguez receive a performance improvement plan or counseling in lieu of termination; and 3) agreement by Varouh to provide a formal counseling to the plaintiff. (See Doc. 40-2, SOF ¶¶ 60-62 (citing Def. Ex. L.)). While referenced by Loyal Source in its moving papers, those emails are not included in the summary judgment record and thus these facts are disregarded.

On May 5, 2021, at 12:41 PM, Varouh responded back to McManus at Goldbelt. (Id., ECF p. 30).   Varouh advised that: 1) she had counseled Rodriguez regarding Goldbelt's concerns the previous week; and 2) Loyal Source's HR department had spoken with Rodriguez that morning and would be following up that afternoon to outline, "the work performance expectations and need to comply with Loyal Source process for requesting travel." (Id.).

On May 5, 2021, at 4:59 PM, Alecia Messam from Loyal Source's HR department emailed Rodriguez:

> Thank you for taking the time to speak with me today. As you mentioned, you will send me a written statement of the issues you have been experiencing while working. Please have your statement completed and back to me by close of business day Thursday 5/6/21. I will give you a call once I review to go over any questions I may have.

(Doc. 40-8, Def. Unmarked Exh., ECF, p. 7).

The next day, May 6, 2021, at 9:57 AM, McManus from Goldbelt emailed Varouh from Loyal Source back: "Mr. Rodriguez is scheduled to travel within the next week and has yet to make accommodations with hotel, air, etc., from my understanding? At this point we are going to remove him from the trip and Mr. Bush will replace." (Doc. 40-5, Def. Ex. O., ECF p. 29).   McManus asked: "Where does [Loyal Source] stand with this employee?  Between the CAC disaster and performance issues, the team has been very patient, but status quo does not work."  (Id.)

As these emails were being exchanged between Goldbelt and Loyal Source employees, the plaintiff drafted a sixteen (16) page, single-spaced memorandum, which was addressed to Varouh and Messam at Loyal Source. (Id., Def. Ex. P., ECF 2-17). The memorandum references numerous instances of age and race discrimination allegedly suffered by the plaintiff at the Army Depot. (Id.) Rodriguez emailed the memorandum to Varouh and Messam at Loyal Source on May 6, 2021, at 3:01 PM. (Doc. 40-8, Def. Unmarked Exh., ECF, p. 7).

On May 6, 2021, at 4:25 PM, McManus from Goldbelt advised Varouh at Loyal Source:

> Per our conversation earlier and after further deliberation with Mr. Bush, we feel it best to move on from Mr. Rodriguez, and have him removed from the contract for performance and inability to complete administrative tasks critical to his job. We will need to retrieve his CAC and any other government issued items.

(Doc. 40-5, Def. Ex. O., ECF p. 29).

On May 7, 2021, Varouh spoke to Rodriguez during the workday and instructed him to turn in his equipment and leave the Army Depot premises. (Id., Def. Ex. R., ECF p. 61).

Prompted by Rodriguez's memorandum, Loyal Source ostensibly investigated and advised the plaintiff, on May 10, 2021, that his allegations of

12

discrimination and retaliation were unfounded and unsubstantiated. (Doc. 40-7, Def. Ex. W, ECF p. 6).

Rodriguez then contacted the Equal Employment Opportunity Commission ("EEOC"). (Doc. 42, SOF ¶ 87).  On March 4, 2022, Rodriguez signed and filed a charge of discrimination with the EEOC. (Doc. 40-7, Def. Ex. U, ECF p. 2). Rodriguez's charge of discrimination used a termination date of May 13, 2021, not May 7, 2021. (Id.).  In responding to Loyal Source's statement of facts in this case, Rodriguez admitted that "[t]he same false allegation," i.e., the wrong date of termination, appeared in his initial complaint in this matter. (Compare Doc. 42, SOF ¶ 93 with Doc. 44, Pl. Resp. to SOF ¶ 93).  Rodriguez also admitted that his May 5-6, 2021 memorandum was the first time that he notified Loyal Source about any claim of race discrimination. (Compare Doc. 42, SOF ¶ 75 with Doc. 44, Pl. Resp. to SOF ¶ 75).

Based on the above facts, Rodriguez's amended complaint asserts four claims: Count I - racial discrimination in violation of Title VII; Count II – national origin discrimination in violation of Title VII; Count III – age discrimination in violation of the ADEA; and Count VI – racial discrimination in violation of Section 1981.  Rodriguez's amended complaint does not contain any claims for retaliation.  After a period of discovery, Loyal Source filed the instant motion for summary judgment, which brings this case to its present posture.

**Jurisdiction**

Because Rodriguez asserts claims pursuant to the ADEA, Title VII, and

Section 1981, the court has jurisdiction pursuant to 28 U.S.C. § 1331. ("The

district courts shall have original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States.").

**Standard of Review**

Loyal Source has filed a motion for summary judgment.  Granting summary

judgment is proper " 'if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4

(3d Cir. 1997) (quoting FED. R. CIV. P. 56(c)).  "[T]his standard provides that the

mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact." Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the

facts in the light most favorable to the party opposing the motion. Int'l Raw

Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990).  The

burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248. A fact is material when it might affect the outcome of the suit under the governing law. <u>Id.</u> Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. <u>Id.</u> at 324.

**Analysis**

Loyal Source attacks Rodriguez's claims from all angles, however, the defendant's motion can best be addressed focusing on two arguments. First, Loyal Source contends that Rodriguez's Title VII and ADEA claims are time-barred. Second, Loyal Source argues that the record cannot demonstrate race discrimination to support Rodriguez's claims. The court addresses these arguments in turn.

### 1. Whether Rodriguez's ADEA and Title VII Claims are Time-Barred

A major point of contention in this case has been Rodriguez's actual date of termination. Loyal Source previously filed a motion for sanctions because Rodriguez's EEOC charge and complaint in this action used May 13, 2021 as the plaintiff's date of termination, not May 7, 2021. (Doc. 27). The court ultimately denied that motion. (Docs. 35-36). Instead, the court permitted Rodriguez to amend his complaint. (Id.)

The amended complaint corrects Rodriguez's date of termination to May 7, 2021. (Doc. 37, ¶¶ 24, 26). Rodriguez concedes that the deadline to file a charge of discrimination with the EEOC was Thursday, March 3, 2022, and admits that the charge was filed on Friday, March 4, 2022. (Id. ¶¶ 26, 32). Nonetheless, Rodriguez requests that equitable tolling be applied to this matter so that his ADEA and Title VII claims may proceed. (Id. ¶ 37).

Loyal Source argues that the record cannot support the application of equitable tolling in this case. After review of the evidence provided by Rodriguez in support of his request, the court agrees with Loyal Source.

Rodriguez has failed to clear up several discrepancies. First, Rodriguez testified that he lived in Scranton, Pennsylvania when Loyal Source terminated him and when he pursued his claim with the EEOC. (See Doc. 40-3, Def. Ex. A., Pl. Dep. 06/01/2023, 46:10-15, 72:7-10). "Title VII requires a claimant in

Pennsylvania to file a charge with the EEOC within 300 days of an unlawful employment practice." Mikula v. Allegheny Cnty. Of PA, 583 F.3d 181, 183 (3d Cir. 2009) (citing 42 U.S.C. § 2000e–5(e)(1); Watson v. Eastman Kodak Co., 235 F.3d 851, 854–55 (3d Cir. 2000). Like Title VII, the ADEA contains provisions requiring a Pennsylvania claimant to file their charge within 300 days of the allegedly illegal act. See 29 U.S.C. § 626(d)(1)(B); Seredinski v. Clifton Precision Prods. Co., 776 F.2d 56, 63 (3d Cir. 1985). Despite his deposition testimony, Rodriguez listed a Westbury, Virginia home address in his EEOC charge. (Doc. 45-3, Pl. Ex. 8, ECF p. 633). The 300-day limitations period also applies to citizens of the Commonwealth of Virginia. See Lewis v. Norfolk S. Corp., 271 F. Supp. 2d 807, 811 & n. 2 (E.D. Va. 2003)(citing Puryear v. Cnty. of Roanoke, 214 F.3d 514 (4th Cir. 2000)).

Regardless of Rodriguez's state citizenship, these 300-day filing requirements are analogous to statutes of limitations. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir. 1994), overruled on other grounds by Rotkiske v. Klemm, 890 F.3d 422, 427 (3d Cir. 2018)(citing Hart v. J.T. Baker Chemical Co., 598 F.2d 829, 831 (3d Cir.1979)). Since these limitations periods were prescribed by Congress, they must be treated seriously. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002) (emphasizing that word "shall" in Section 2000e-5(e)(1) makes the act of filing a

charge within the specified time period mandatory); <u>Baldwin County Welcome Center v. Brown</u>, 466 U.S. 147, 152 (1984) (*per curiam*) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants[.]").

In this case, there is no longer a factual dispute over Rodriguez's termination date.  The plaintiff agrees that Loyal Source terminated his employment on May 7, 2021, not May 13, 2021.  Rodriguez also agrees that the deadline to file a charge of discrimination was March 3, 2022, or 300 days after May 7, 2021.[6]  Consequently, Rodriguez fell short of his statutory obligations. Absent an applicable saving doctrine, cases with untimely EEOC charges must be dismissed.  <u>See Ruehl v. Viacom, Inc.</u>, 500 F.3d 375, 383 (3d Cir. 2007).

Rodriguez advocates for equitable tolling to be applied under the circumstances.  "Equitable tolling stops the statute of limitations from running when an EEOC charge's accrual date has already passed." <u>Id.</u> at 384 (citing <u>Oshiver</u>, 38 F.3d at 1387).  This doctrine, however, is to be used sparingly. <u>See Nat'l R.R. Passenger Corp.</u>, 536 U.S. at 113 (citations omitted).

---

[6] "[A]n adverse employment action occurs, and the statute of limitations therefore begins to run, at the time the employee receives notice of that action and termination is a delayed but inevitable result." <u>Watson v. Eastman Kodak Co.</u>, 235 F.3d 851, 852–53 (3d Cir. 2000)(citing <u>Delaware State College v. Ricks</u>, 449 U.S. 250 (1980)).

Equitable tolling may be appropriate in three principal situations: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum. <u>Oshiver</u>, 38 F.3d at 1387. Rodriguez does not contend that Loyal Source actively misled him about his termination date or that he timely filed with the EEOC in the wrong geographic district. Rather, in opposing summary judgment, Rodriguez advances the second option, contending that "bureaucratic delay" by the EEOC prevented him from timely filing the charge of discrimination:

> The EEOC drafted the Charge of Discrimination for Mr. Rodriguez's signature on the same day it was due to be filed, March 3, 2022, however, the EEOC had omitted important information in the initial draft which necessitated revisions. See Ex. 8, pg. 7. The EEOC made the revisions and the charge was perfected on March 4th, 2022, one day after the statutory deadline. See Ex. 8 pg. 8. As the delay in exhausting his administrative remedies was not his fault, Mr. Rodriguez is entitled to equitable tolling.

(Doc. 45, Pl. Br. in Opp. at 6-7).

After carefully reviewing the summary judgment record, the EEOC did not prevent Rodriguez from asserting his rights in any way, let alone some extraordinary way.

For instance, Rodriguez answered interrogatories indicating that he did not communicate with the EEOC until March 2, 2022, or 299 days following his termination. (Doc. 40-7, Def. Ex. Y, Pl. Ans. to Interrog. #17a., ECF p. 17). The record reflects that the EEOC then immediately began processing his claim. On March 2, 2022, the EEOC rescheduled a phone interview from April 2022 to 2:00 PM that same day. (Doc. 45-3, Pl. Ex. 8, ECF p. 630). The EEOC provided a draft charge of discrimination to the plaintiff on March 3, 2022 at 7:50 AM. (Id., ECF p. 632). Rodriguez contends that changes to the charge of discrimination then had to be made. In opposing summary judgment, he has not indicated what those changes were, but it is undisputed that they did not include correcting his date of termination. Operating from Rodriguez's use of May 13, 2021 as his termination date, the EEOC had another draft charge ready for the plaintiff on March 4, 2022. Although the EEOC provided Rodriguez with a charge on actual Day 301, the EEOC was relying upon a date of termination that Rodriguez himself had provided. (Id., ECF p. 626). Despite Rodriguez's attempts to shift blame onto the EEOC, the agency completed its duties in a timely manner based on the facts provided by the plaintiff and under the circumstances that Rodriguez himself created.

In seeking equitable tolling, Rodriguez also emphasizes that he proceeded before the EEOC *pro se*. But his deposition testimony indicates that he: 1)

20

consulted with an attorney within ten (10) days of his termination; 2) "conversed with several firms"; and 3) was "forewarned by other attorneys" about the time limitations. (See Doc. 40-4, Def. Ex. G, Pl. Dep. 07/20/2023, 149:12-153:23). Rodriguez also testified that he pursued employment discrimination claims against several past employers, which involved EEOC proceedings. (See Doc. 40-3, Def. Ex. C, Pl. Dep. 06/01/2023, 6:21–7:17, 22:3–37:3, 79:3–82:11, 108:1–20, 122:9–123:4).

Under such circumstances, equitable tolling is not warranted. Summary judgment will thus be granted in favor of Loyal Source on the ADEA and Title VII claims in this case. His claims for age and national origin discrimination cannot move forward.

## 2. Whether Rodriguez Has Demonstrated Race Discrimination

Although Rodriguez's Title VII claims are time barred, Section 1981 allows for individuals who believe they experienced racial discrimination in the workplace to file a separate private right of action. See Gooding v. Warner-Lambert Co., 744 F.2d 354, 359 (3d Cir. 1984)("The avenues of relief available under Title VII and § 1981 are independent."). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... to the full and equal benefit of all laws ... as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). The

phrase "make and enforce contracts" is statutorily defined to include: "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

Rodriguez's amended complaint may be construed to raise race discrimination claims relative to his termination and for hostile work environment. (Doc. 37, ¶¶ 11, 14-22, 77). Section 1981 provides a four-year limitations period for such claims. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 383 (2004). And unlike his other time-barred race discrimination claims, "[t]he filing of a Title VII charge and resort to Title VII's administrative machinery are not a prerequisite for maintaining a section 1981 suit." Gooding, 744 F.2d at 359 (citing Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 461 (1975)).  The court will address Rodriguez's wrongful termination claim before turning to his hostile work environment discrimination claim.

### a. Discriminatory Treatment in Rodriguez's Termination

To prevail in a Section 1981 action, Rodriguez must demonstrate that (1) he is a member of a racial minority[7]; (2) intent to discriminate on the basis of race

---

[7] Regarding Section 1981, "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics.  Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory." Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613, (1987). "[C]ourts have treated Hispanic as a race for purposes of [Section] 1981 because Hispanic people are often

by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute, which includes the right to make and enforce contracts. See Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001).

Regarding proof of intentional discrimination, Section 1981 follows the same analytical framework as Title VII race discrimination claims. See Qin v. Vertex, Inc., 100 F.4th 458, 470 (3d Cir. 2024). Rodriguez's case relies upon circumstantial evidence, inferences, and arguments that Loyal Source's stated reasons for termination are pretextual. Consequently, the McDonnell Douglas three-part burden-shifting framework applies to his claims. See id. at 472–73 (citing Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04. (1973)).

Under this framework, the plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. Id. at 473 (cleaned up).

---

perceived as non-white." Mojica v. Advance Auto Parts, Inc., 15-CV-1418, 2016 WL 107844, at *4 (E.D. Pa. Jan. 11, 2016)(citing Petrone v. City of Reading, 541 F. Supp. 735, 738 (E.D. Pa. 1982)).

Per Loyal Source, Rodriguez cannot demonstrate any form of racial discrimination by the defendant in this case. Rodriguez counters by referring to his testimony about his supervisor's remarks in the workplace. Emails of record indicate that his supervisor, Tim Bush, communicated with representatives from Goldbelt, the prime contractor, and Loyal Source, the subcontractor employing the plaintiff, and that all of these individuals were involved in the termination decision. [8]  Such evidence is sufficient to demonstrate a *prima facie* race discrimination claim.

Once a plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. See Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 255 (1981).  Loyal Source has produced emails and other documents regarding Rodriguez's ongoing performance issues and inability to complete administrative tasks. (See e.g. Doc. 40-5, Pl. Ex. O., S. McManus Email 05/06/2021, ECF p. 29).  Thus, Loyal Source has met its burden at step two.

To defeat summary judgment at the third McDonnell Douglas step, a plaintiff must demonstrate that the employer's proffered reasons were not the

---

[8] Loyal Source's asserts that decision-makers from other entities removed Rodriguez from the Army Depot.  After reviewing the record, there are genuine issues of material fact as to Loyal Source's participation and involvement in the ultimate decision to terminate the plaintiff.

true reasons for the employment decision, i.e., that the reasons were pretext for intentional discrimination. <u>Burdine</u>, 450 U.S. at 255. "To establish pretext, 'a plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a...determinative cause of the employer's action.' " <u>Qin</u>, 100 F.4th at 474–75 (3d Cir. 2024)(quoting <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994); <u>see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media</u>, 589 U.S. 327, 336 (2020).

Title VII and Section 1981 discrimination claims differ when it comes to causation. Pursuant to Section 1981, "a plaintiff bears the burden of showing that race was a but-for cause of [his] injury." <u>Comcast Corp.</u>, 589 U.S. at 333. The Supreme Court has rejected applications of Title VII's "motivating factor" causation test in Section 1981 cases. <u>Id.</u> at 336.

Loyal Source argues that Rodriguez has not identified a genuine issue of material fact regarding evidence of pretext, highlighting Rodriguez's agreement with components of the defendant's stated reasons for termination. For example, in responding to Loyal Source's statement of facts, Rodriguez admitted that he "testified at his deposition that he was actually slower than other employees, and

that it was due to his age." (<u>Compare</u> Doc. 42, SOF ¶ 46 <u>with</u> Doc. 44, Pl. Resp. to SOF ¶ 46).

Furthermore, per Rodriguez, a slip-and-fall at work in August 2020 also impacted his work performance. (Doc. 42, SOF ¶ 39).  During his testimony in workers' compensation proceedings, Rodriguez recalled how his supervisors questioned why he was taking rests and not producing more. (<u>Id.</u> ¶ 40). Rodriguez also testified that the job required him to lift and carry heavy objects, stand, and bend and that he "just couldn't do it anymore." (<u>Id.</u> ¶¶ 39-40). According to Rodriguez's workers' compensation testimony, the work injury caused him to be terminated:

> I got a call from my Human Resources. And they basically told me that Mr. – the manager who I reported it to had been telling them that I – I wasn't up to pay in my work, you know, I wasn't able to lift stuff and stand and do the work. So, he – he couldn't use me at that facility because of that.

(<u>Id.</u> ¶ 42).

In light of the above, Rodriguez has not challenged evidence reflecting his belief that some of Loyal Source's complaints about his performance are true. Consequently, a reasonable jury would not disbelieve Loyal Source's explanation that Rodriguez experienced performance issues which prompted his termination.

That leaves Loyal Source's other proffered reason for Rodriguez's termination: the plaintiff's "inability to complete administrative tasks critical to his

job." (Doc. 40-5, Pl. Ex. O., S. McManus Email, 05/06/2021 4:25 PM, ECF p. 29).

Rodriguez admits that he had difficulties completing the e-QIP background

investigation forms. (Doc. 42, SOF ¶ 24). On the other hand, Rodriguez testified

that Bush impeded his efforts to complete the e-QIP paperwork and that such

interference prompted him to send a written complaint about Bush to Loyal

Source by email. (Doc. 40-3, Def. Ex. C, Pl. Dep. 06/01/2023, 231:23–233:7).

That email, dated September 10, 2020, specifically alleges age discrimination

and disability discrimination by Bush. (Doc. 40-7, Def. Ex. E., ECF pp. 3-4). It

does not, however, mention race discrimination. (Id.)

As for completing arrangements to go on a TDY mission, Rodriguez

asserts that Bush discriminated against him by not sending the plaintiff on these

missions. Rodriguez complained directly to Bush by email about this ongoing

issue. (Doc. 40-5, Def. Ex. K, Pl. Email 03/24/2021, ECF p. 4). This email also

does not reference racial discrimination:

> I am under the strong opinion, that this constant Age
> Discrimination should come to an immediate halt. As I
> mentioned to you before, how fast I work at the shop has
> absolutely no bearing on TDY, I've done thousands of Field
> TDY and lead a team and have won hundreds of awards
> for my accomplishments.[9]

(Id.)

---

[9] Rodriguez testified in a similar manner: he believed that Bush's decision-making regarding TDY missions stemmed from age discrimination. (Doc. 40-3, Def. Ex. C, Pl. Dep. 217:18–219:22).

Rodriguez's pretext case thus relies on evidence advancing several discriminatory causes for his termination, including age, race, national origin, disability, and work injury.  To move forward with his Section 1981 claim, Rodriguez must demonstrate that race was a but-for cause of his termination.  But-for causation "is established whenever a particular outcome would not have happened 'but for' the purported cause." Bostock v. Clayton Cnty., Georgia, 590 U.S. 644, 656 (2020)(citing Gross v. FBL Financial Services, Inc., 557 U.S. 167, 176 (2009)).  "In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." Id.

Under the law, events can have more than one but-for cause. See id.  With that said, the United States Supreme Court has also emphasized that an employment discrimination claim requiring but-for causation cannot succeed unless the employee's protected trait actually played a role in the employer's decision-making process and had a determinative influence on the outcome. See Gross, 557 U.S. at 176 (referencing Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, (1993)).

Rodriguez's age and his physical condition are at the forefront of his discrimination claims, not race.  With this record, a reasonable jury can consider "ongoing performance issues" and think that Loyal Source's reasons for

Rodriguez's termination are employer-manufactured to hide those considerations. After all, when Rodriguez first complained about Bush to Loyal Source in September 2020 and referenced age and disability discrimination, Bush ostensibly began drafting a document pertaining to the plaintiff's work performance. (Doc. 40-5, Def. Exs. L-M, ECF pp. 6-24 (listing events beginning in November 2020)). When Rodriguez complained a second time about age discrimination directly to Bush in March 2020, Bush denied such discrimination in a reply email to the plaintiff, but he then also sent that document listing the plaintiff's performance shortcomings to Shon McManus at Goldbelt. (Id.)

Rodriguez admits that his May 5-6, 2021 memorandum was the first time that he notified Loyal Source about any claim of race discrimination. (Doc. 42, SOF ¶ 75). Rodriguez also admits that the week prior to submitting this document, he was informed about Bush's complaints concerning his performance. (Id. ¶ 73). Thus, with such admissions regarding timing, Rodriguez's evidence is that, over several months: 1) he accused Bush of age and disability discrimination; 2) Bush responded to those complaints by sending a memorandum to Goldbelt about the plaintiff's "performance issues"; 3) Goldbelt advised Loyal Source of the issues raised by Bush; 4) Loyal Source counseled plaintiff based on these issues; and then 5) Rodriguez sent a complaint of age *and* race discrimination to Loyal Source accusing Bush, Tagliari, and other

unnamed individuals of making various remarks, undermining or sabotaging his work, and attempting to provoke physical confrontations. (Doc. 40-6, Def. Ex. P. Pl. Memo to Loyal Source, May 5-6, 2021).

That 16-page memorandum concludes: "I realize and know no company will admit wrong doing, and already once before it occurred, all I can say is that if I am hit with a hammer, I will hit back with a sledge hammer because my life is at stake and that of my beloved family." (Id., ECF p. 9). This evidence does not indicate that Loyal Source's legitimate reason was pretext for race discrimination. Consequently, a reasonable jury could not determine that race discrimination was a but-for cause of Rodriguez's termination or that race had a determinative influence on the plaintiff's employment outcome. Summary judgment is thus warranted in favor of Loyal Source's Section 1981 claim as it relates to discriminatory treatment and wrongful termination.

### b. Hostile Work Environment Discrimination

Loyal Source also moves for summary judgment on Rodriguez's race-based hostile work environment claim. That claim also follows the Title VII analytical framework. Qin, 100 F.4th at 470. To succeed on such a claim under Section 1981, Rodriguez must demonstrate that: 1) he suffered intentional discrimination because of his race; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected him, 4) the discrimination would

30

detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability, meaning the employer is responsible. Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017)(citing Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)(cleaned up)).

For the reasons discussed above, the intentional discrimination component of Rodriguez's hostile work environment claim falls short due to the plaintiff's failure to demonstrate but-for causation. Additionally, Rodriguez's allegations about race-based discrimination in the workplace are not severe or pervasive enough to support a hostile work environment claim against Loyal Source. As with the above, where Rodriguez offers instances of objectively severe conduct, such conduct is associated with age discrimination.

When determining whether an environment is sufficiently hostile or abusive, courts are directed to look at all the circumstances, "including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " Faragher v. City of Boca Raton, 524 U.S. 775, 787–78 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "[T]he resolution of that question is context-specific," Castleberry, 863 F.3d at 264, with consideration of the overall scenario, see Qin, 100 F.4th at 471.

In assessing whether discriminatory conduct is "severe or pervasive," the court must also consider the frequency of the conduct in the context of the case and whether the alleged discrimination was physically threatening, humiliating, or unreasonably interfered with Rodriguez's work performance. See id. (citing Nitkin v. Main Line Health, 67 F.4th 565, 571 (3d Cir. 2023); Harris, 510 U.S. at 23).

In his deposition, Rodriguez focused on remarks involving his food choices during workplace lunch breaks:

- His coworker, Tagliari, made two comments about the "terrible" smell and appearance of Rodriguez's lamb stew and used the word "Spanish" in his insults about it. (Doc. 40-3, Def. Ex. A., Pl. Dep. 06/01/2023, 169:11-18, 176:23–182:11). Bush also joined in with remarks from Rodriguez's co-workers about his homemade lunches, calling it "Spanish food." (Id. 179:21–180:13, 193:6-197:5).

- On one occasion, another unnamed coworker tried Rodriguez's paella and told the plaintiff it tasted "like feces." (Id. 200:15–201:15).

- On one occasion, Tagliari and another unnamed technician made a sexual reference to the price of a Cuban sandwich, "how come it's so expensive, you know, what's it do, cause an erection or something?" (Id. 169:11–172:10, 182:17-20, 183:11-184:8)

- On another occasion, Tagliari and the other unnamed worker referenced adding mayonnaise to Rodriguez's food and said, "that's what we think of Spanish food." (Id. 172:11–173:12, 184:9–187:7).  Bush was also involved and remarked: "That's how us Anglo-Saxons deal with Spanish food." (Id. 193:6-12)

- In one instance, Bush told the plaintiff to eat his lunch in another area: "take that stinking food out of here, makes me sick, go eat in the back of the warehouse." (Id. 179:21–180:13, 193:6-197:5).

"[C]onduct must be extreme to amount to a change in the terms and conditions of employment[.]" <u>Faragher</u>, 524 U.S. at 788. "Simple teasing…offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes[.]" <u>Id.</u> (cleaned up).

Assuming Rodriguez's testimony to be true, he experienced rude remarks about what he brought to the workplace for his lunch breaks and heard some crass commentary about food that he enjoyed. Of the above events, only Bush's directive to eat elsewhere implicates some change that resulted from those remarks. Even then, in context, Bush's remarks did not impact the plaintiff's work performance. Rodriguez was not working when taking his lunch break.

Further assuming that comments about the plaintiff's lunch implicate the terms and conditions of his employment contract, Rodriguez testified that Bush did not direct the plaintiff to eat elsewhere other than that one day. (Doc. 40-3, Def. Ex. C., Pl. Dep. 06/01/2023, 193:6-197:5). Rather, Rodriguez admitted that he made the choice to eat away from his coworkers moving forward. (<u>Id.</u>) Thus, although inappropriate, these various remarks about Rodriguez's food do not demonstrate a hostile work environment. They were not so extreme as to impact his working conditions.

Rodriguez also referenced other workplace remarks that did not involve food:

- Bush said, "another Puerto Rican" on Rodriguez's first day of work at the Army Depot after observing flags displayed on the plaintiff's car. (190:15-193:6).

- On another occasion, after overhearing a voicemail from Rodriguez's phone spoken in Spanish, Bush allegedly said, "that's Spanish, we don't speak Spanish here in this place," (see id. at 197:6-14), or "[s]hut that Spanish trash up!" (Doc. 40-6, Def. Ex. P. Pl. Memo to Loyal Source, May 5-6, 2021 at ECF p. 9).

- Bush, after hearing Rodriguez speaking Spanish to a government employee from Puerto Rico, told the plaintiff: "we speak English here, not Spanish." (Id. p. 10).

Similarly, these comments, if true, are discourteous and show contempt toward millions of Americans.  But federal anti-discrimination laws do not create a "general civility code[.]" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).  They only forbid behavior "so objectively offensive to alter the conditions of the victim's employment." Id. (internal quotations omitted).  These remarks are not so severe as to demonstrate a hostile work environment.

Moreover, even when considering the cumulative nature of these remarks, as is required, Rodriguez provides no other evidence that any race-based remarks altered his working conditions or were otherwise associated with the various criticisms Bush offered about the plaintiff's production in the workplace or why Bush did not permit Rodriguez to participate in TDY missions.  Rather,

Rodriguez's case runs into the same issues described above because the plaintiff attributes numerous workplace events to his time-barred age discrimination claims. (Doc. 45-2, Pl. Br. in Opp. at 12 ("Further, Mr. Bush discriminated against Plaintiff on regular daily basis on the basis of his age by verbal assaults, including telling him that he was too slow, assisting his co-workers while ignoring Plaintiff, subjecting Plaintiff to strict scrutiny while allowing his co-workers to engage in the same activities without threatening to or disciplining them and by physically threatening Plaintiff [sic].")).

And like the lengthy memorandum he submitted to Loyal Source just before his termination, Rodriguez previously documented his complaints about Bush playing favorites, making angry comments, and blaming the plaintiff for things he had no control over in March 2021. (Doc. 40-7, Def. Ex. K, Pl. Email 03/24/2021). Rodriguez sent that email directly to Bush and Bush alone. (Id.)  None of the above remarks are mentioned. (Id.) Plaintiff's race is not referenced. (Id.) Rather, Rodriguez wrapped up his complaint as follows:

> In conclusion, I have noticed since I started working here that I am the sole outcast to you do to my age, [sic] I am the only "slow" one when I do up to 10-14 items a day, and have the lowest error rate of all I've been told by QC staff. Let me have the proper tools to work with, the proper training, the corrected manuals, and most importantly, the proper and correct respect I deserve.

(Id.)

35

Consequently, Rodriguez cannot demonstrate "severe or pervasive conduct" on the basis of race.  Summary judgment will also be granted in favor of Loyal Source on Rodriguez's Section 1981 hostile work environment claim.

**Conclusion**

For the reasons set forth above, Loyal Source's motion for summary judgment (Doc. 40) will be granted and the Clerk of Court will be directed to close this case.  An appropriate order follows.

Date: 3/20/25

**JUDGE JULIA K. MUNLEY**
**United States District Court**